IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Criminal No. 3:07-CR-380-D |
| | § | |
| LONNIE OLIVER, JR., | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant Lonnie Oliver, Jr. ("Oliver") moves to suppress incriminating statements that he maintains were involuntarily made during a custodial interrogation, in violation of his Fifth Amendment rights; a cardboard box and its contents that were searched without a warrant; and the contents of a laptop computer that agents seized without a warrant before the laptop computer was later searched pursuant to a warrant. Following an evidentiary hearing, and for the reasons that follow,[1] the court denies the motion.

I

Oliver is charged by indictment with the offenses of conspiracy to commit mail fraud, mail fraud, aggravated identity theft, and theft of public money, in violation of 18 U.S.C. §§ 1349, 1341, 1028A(a)(1), and 641. The United States of America (the "government") filed a criminal complaint against Oliver and

_____

[1] Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

five others for the criminal conduct that formed the basis of the indictment. Federal agents arrested Oliver the following afternoon pursuant to a warrant. Oliver was driving his car about one-half mile from his residence. Postal Inspector Marcus C. Ewing ("Agent Ewing") effected the traffic stop. Based on information provided Agent Ewing, he believed Oliver might be uncooperative. But when the agent pulled Oliver's car over, Oliver began yelling that he did not have a weapon, and he threw his hands in the air. Based on Oliver's reaction, Agent Ewing concluded that Oliver knew exactly who the agents were and that he had been involved with law enforcement before. Oliver was handcuffed, informed that there was a federal warrant for his arrest, and placed in a law enforcement vehicle.

The officers at the scene, including Agent Ewing, began discussing transporting Oliver to his residence. It was conveniently located in relation to the arrest site, they wanted to return his vehicle to his house, and they did not want to take custody of his personal belongings. After they placed Oliver in the law enforcement vehicle, Agent Ewing asked Oliver whether they could take him to his residence. Oliver hesitated because he thought the agents wanted his consent to search his house. Agent Ewing assured Oliver that they would not search his house without a warrant. Oliver told Agent Ewing that a search could not be conducted without his permission; he knew they could not enter his

home without his consent.  The agents then decided to take Oliver to the local police station.  While they were en route, Oliver stated that they could go to his house.  But after the vehicle turned around to head in that direction, Oliver changed his mind. Special Agent Steven Grell, U.S. Department of Labor, Office of Inspector General ("Agent Grell"), who was driving, pulled the vehicle off the road and began talking with Oliver about whether he wanted to be taken to his house.  After the agents reassured him that they did not want to search his house, that they were just going there to talk to him, and that he would be more comfortable there, Oliver consented to being taken to his home.  The agents had Oliver's house keys, and he gave them permission to enter his residence.

Upon entry, Agents Ewing and Grell took Oliver to the kitchenette area.  Other federal agents entered and exited the house at various points in time, but just these three were seated at the kitchen table.  Oliver was still handcuffed.

After they sat down, Agent Ewing began explaining what was going on: that agents had a federal warrant for his arrest concerning the Texas Workforce Commission and theft of benefits. Agent Ewing tried to give Oliver a synopsis of why he had been arrested and why he was there.  Agents Ewing and Grell asked Oliver if he would like to answer questions, and he responded that he would.  Before any questioning commenced, however, Agent Ewing

- 3 -

began at about 3:06 p.m. to give Oliver *Miranda* warnings contained in Form 1067, a U.S. Postal Inspection Service document entitled, "Warning and Waiver of Rights."  The Form 1067 has two sections: a top half—captioned "Warning"[2]—and a bottom half—entitled "Waiver."[3]  Agent Ewing placed the Form 1067 in front of Oliver so

---

[2]The "Warning" section states:

> BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.
>
> You have a right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> If you decide to answer questions now without a lawyer present, you will still have the right to stop answering questions at any time. You have the right to stop answering questions at any time until you talk to a lawyer.
>
> I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are.

Form 1067.

[3]The "Waiver" portion states:

> I am willing to discuss subjects presented and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

*Id.*

- 4 -

that he could read it. Agent Ewing read aloud the entire "Warning" section, one item at a time, as Oliver looked on and appeared to read it silently to himself. Oliver then signed his name under the Warning section. Agent Ewing witnessed the signature at 3:15 p.m. The time lapse of approximately nine minutes after he began the process of warning Oliver was the result of banter during which Oliver questioned about why they wanted to talk to him when he had not done anything wrong, and Oliver expressed concerns that other federal agents were present for the purpose of attempting to conduct a search of his home. At no time during the conversation did Oliver appear not to understand what Agent Ewing was saying or what was being read to him. Oliver appeared to know exactly what was going on, was coherent, knew exactly what he was doing, was articulate, and did not appear to be under the influence of alcohol or drugs.

Agent Ewing then proceeded to read aloud the "Waiver" section. After he finished, Oliver stated that he did not want to sign this part of the form but that he wanted to talk to them. Agent Ewing wrote "Refused to sign" underneath the "Waiver" section of the Form 1067, and he noted the time of 3:15 p.m. Oliver did not explain why he did not want to sign. At no point during the questioning did Oliver tell Agents Ewing and Grell that he did not want to speak to them or answer their questions. During the entire time, he never requested a lawyer or mentioned the word "attorney."

Special Agent in Charge Frank Archie, U.S. Department of Labor, Office of Racketeering and Fraud Investigations ("SAC Archie"), later entered into the conversation and instructed Agent Grell to remove the handcuffs and get Oliver a glass of water. SAC Archie asked Oliver how Agents Ewing and Grell had been treating him, and Oliver responded, in effect, that they were treating him fine and that they were "respectful." SAC Archie again reminded Oliver of his rights before he questioned him, and Oliver stated that he understood them. During the approximately two-hour period of questioning, Oliver made several incriminating statements to the three agents.[4]

About one week later, the agents investigating Oliver's case discovered that he had been dating someone who might be in possession of incriminating evidence. SAC Archie and Special Agent Heather McReynolds, U.S. Department of Labor, Office of Inspector General ("Agent McReynolds"), went to the apartment of Oliver's girlfriend, Erika Armstrong ("Armstrong"). After Armstrong let the two agents in, Agent McReynolds asked Armstrong if Oliver had left any items in the apartment. Oliver did not reside there; according to Armstrong, he was "just in and out." Only Armstrong's name was on the apartment lease, but she did give him a key to the

---

[4]Early in the interview, Agent Ewing asked Oliver whether he would consent to the search of his house. When Oliver responded "No," the agents did not reopen the subject again. Oliver did sign a consent form for agents to search his car.

apartment.

Oliver initially brought over clothes, and he later brought "stuff" from work, telling Armstrong that he worked from home. Armstrong observed Oliver working with a laptop and a black notebook. He also brought a small brown cardboard box to her apartment. The box was not locked or taped. Once when Oliver was going out of town, he told Armstrong that he had left a box under her bed in the bedroom. He told her "don't mess with it, don't touch it." Oliver occasionally took the box out of the apartment, but he then returned it.

Later, Armstrong saw the box in her dining room, and she sometimes observed Oliver open it. After Oliver had been gone several days, she looked for something in the box that would tell her where to find him. Before the agents arrived at her apartment, Armstrong had already discovered all of the cardboard box's contents: a notebook, a clear zip-lock bag full of credit cards, a white envelope filled with different identification cards, and an assortment of other paperwork. After the agents arrived at her apartment, Armstrong brought them into her dining room and pointed to the cardboard box on the floor. When Agent McReynolds asked if they could take the box with them, Armstrong consented.

Armstrong also took the agents to her bedroom, where the laptop that Oliver had left there was situated on her bed. Armstrong had earlier tried to access the computer but discovered

that it was password protected. Armstrong explained to the agents that the laptop also belonged to Oliver. When Agent McReynolds requested that they take the laptop, Armstrong consented. The agents searched the contents of the cardboard box without a warrant, but they obtained a search warrant before searching the laptop computer.

Oliver now moves to suppress the incriminating statements he made during the custodial interrogation, arguing that he did not effectively waive his Fifth Amendment rights. Oliver also seeks to suppress the evidence that agents discovered inside the cardboard box as a result of a warrantless search. He argues that Armstrong lacked authority to consent to a search of the cardboard box. Similarly, Oliver seeks to suppress the evidence obtained during the search of the laptop computer. He does not challenge the validity of the search warrant for the laptop computer, but he does argue that the agents unlawfully seized it without a warrant, because Armstrong had no authority to consent to its seizure.

## II

The court first determines whether Oliver's incriminating statements must be suppressed.

### A

"A waiver of *Miranda* rights must be voluntarily made, and a hearing may be required to determine its voluntariness." *United States v. Guanespen-Portillo*, 514 F.3d 393, 403 (5th Cir. 2008).

> The determination of whether a waiver is
> voluntarily made has two distinct dimensions:
> "First, the relinquishment of the right must
> have been voluntary in the sense that it was
> the product of a free and deliberate choice
> rather than intimidation, coercion, or
> deception. Second, the waiver must have been
> made with a full awareness of both the nature
> of the right being abandoned and the
> consequences of the decision to abandon it."

*Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "Whether a waiver of the Fifth Amendment privilege is voluntary depends on 'the absence of police overreaching, not on free choice in any broader sense of the word.'" *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (internal quotation marks omitted)).

"Whether the defendant waived his rights is a fact question, and such a waiver may be direct or in some cases, clearly inferred from the defendant's words and actions." *United States v. Chapa-Garza*, 62 F.3d 118, 121 (5th Cir. 1995) (citing *United States v. Collins*, 40 F.3d 95, 98-99 (5th Cir. 1994)). "Mere answering of questions is insufficient to show a waiver; there must be some affirmative act demonstrating waiver of *Miranda* rights." *Id.* (citing *Collins*, 40 F.3d at 99). "In determining whether defendants have validly waived their *Miranda* rights, the court must take into account the 'totality of the circumstances surrounding the interrogation.'" *United States v. Laury*, 985 F.2d 1293, 1315 (5th Cir. 1993) (quoting *United States v. McClure*, 786 F.2d 1286, 1289 (5th Cir. 1986)).

"[I]f a defendant shows that a confession was obtained while

he was under a custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). "[A]s with a challenge to the voluntariness of a confession, when the defendant challenges the validity of his waiver of his *Miranda* rights, the government bears the burden of proving the validity of the waiver by a preponderance of the evidence." *United States v. Garcia Abrego*, 141 F.3d 142, 171 (5th Cir. 1998). Because the parties agree that Oliver was under a custodial interrogation when he made the statements that are the subject of his motion, the government must prove by a preponderance of the evidence that Oliver voluntarily waived his Fifth Amendment right against self-incrimination.

"The Courts of Appeals have unanimously rejected the . . . argument that refusal to sign a written waiver form precludes a finding of waiver." *North Carolina v. Butler*, 441 U.S. 369, 376 n.5 (1979); *see*, *e.g.*, *Goodwin v. Johnson*, 224 F.3d 450, 456 (5th Cir. 2000) ("A refusal to sign a waiver form is insufficient to show invocation of one's Fifth Amendment right to counsel. A refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstances of custody." (internal quotation marks and citations omitted)).

In *United States v. Broussard*, 80 F.3d 1025 (5th Cir. 1996), the defendant "did not orally state that he refused to waive his

rights, [but] he refused to sign the waiver card, and the word 'refuse' was later written on the card." *Id.* at 1035. Law enforcement personnel subsequently read the defendant his rights, which the defendant said he understood. The defendant then agreed to answer questions and made incriminating statements. *Id.* The Fifth Circuit held that the district court did not err in admitting these incriminating statements. *Id.*

Likewise, in *Chapa-Garza* the defendant, after being advised of his *Miranda* rights, signed a form acknowledging that he understood these rights. *Chapa-Garza*, 62 F.3d at 121. Although the defendant "refused to sign that portion of the form in which he waived his rights," "he agreed to speak with the officers regarding his escape." *Id.* The defendant's later incriminating statements were admissible, because the defendant indicated through his body language and words that he had voluntarily waived his Fifth Amendment rights. *Id.* at 121-22 (noting that the custodial interrogation was "cordial" and "conversational" after the defendant said he wanted to talk). "The mere refusal to sign a written waiver does not automatically render inadmissible all further statements made by the defendant." *Id.* at 122.

B

The fact that Oliver refused to sign the "Waiver" portion of the Form 1067 does not preclude a finding that he voluntarily waived his Fifth Amendment rights, so long as Oliver through other

- 11 -

means manifested his intention to waive these rights. Before Oliver signed the Form 1067 indicating that he fully understood his Fifth Amendment rights, Ewing read aloud all these rights, one-by-one, and Oliver had an opportunity himself to read his *Miranda* rights. Agent Ewing credibly testified that Oliver appeared to understand his Fifth Amendment rights and that he never asked any questions about these rights. Agent Ewing, Agent Grell, and SAC Archie all testified credibly that Oliver appeared coherent and articulate throughout the interview and that he knew exactly what he was doing. Although Oliver refused to sign the "Waiver" portion of the Form 1067, Agents Ewing and Grell both testified credibly that Oliver expressly stated that he wanted to talk to them despite his refusal to sign. Throughout the approximately two-hour interview, Oliver never stated that he did not want to talk or that he was not waiving his rights. Moreover, Oliver never even mentioned the word "attorney."

When SAC Archie arrived at Oliver's residence about one-half hour into the interrogation, he asked Oliver how Agents Ewing and Grell were treating him, and Oliver responded that they were treating him fine and that they were "respectful." In addition to all these indicators that Oliver knowingly waived his Fifth Amendment rights, Agents Ewing and Grell also credibly testified that, based on Oliver's responses to other requests to search his house and car, *see supra* note 4, it was apparent that Oliver fully

understood his constitutional rights.  Further, Oliver's extensive criminal background and familiarity with the legal system bolster this conclusion.  *See United States v. Oliver*, 2007 WL 4480659, at *1 (N.D. Tex. Dec. 21, 2007) (Fitzwater, C.J.) (recounting Oliver's criminal history).  The court therefore finds that the government has proved by a preponderance of the evidence that Oliver voluntarily waived his Fifth Amendment rights before agents questioned him.  Accordingly, the court denies Oliver's motion to suppress the statements he made during the  interrogation.

III

The court next analyzes the lawfulness of the government's warrantless search of the cardboard box.

A

"A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional."  *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)).  "However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid."  *Id.* (citing *United States v. Castro*, 166 F.3d 728, 733 n.7 (5th Cir. 1999) (en banc)).

"In *Katz v. United States*, 389 U.S. 347 . . . (1967), the Supreme Court established that a 'search' occurs for Fourth Amendment purposes when the government violates a subjective

expectation of privacy that society considers objectively reasonable." *United States v. Runyan*, 275 F.3d 449, 457 (5th Cir. 2001). For purposes of this motion, the court assumes that Oliver had a protectable privacy interest in the cardboard box.[5]

B

The government contends that even if Armstrong did not have authority to consent to a search of the cardboard box, *see United States v. Salinas-Cano*, 959 F.2d 861, 865 (10th Cir. 1992) (holding that defendant's girlfriend lacked authority to consent to search of unlocked suitcase that defendant left at her apartment), the search did not contravene the Fourth Amendment because Armstrong had already searched the contents before the agents arrived at her apartment.

The Fifth Circuit "has recognized that 'a police view subsequent to a search conducted by private citizens does not constitute a "search" within the meaning of the Fourth Amendment so long as the view is confined to the scope and product of the initial search.'" *Runyan*, 275 F.3d at 458 (quoting *United States v. Bomengo*, 580 F.2d 173, 175 (5th Cir. 1978)). The Supreme Court first recognized the private search doctrine in *Walter v. United States*, 447 U.S. 649 (1980). *See Runyan*, 275 F.3d at 459.

---

[5]"[I]n the instant case—which involves a search of personal property rather than real property—we find that the first, third, and fourth *Cardoza-Hinojosa* factors are most directly applicable and should be dispositive." *Runyan*, 275 F.3d at 457-58.

- 14 -

In *United States v. Jacobsen*, 466 U.S. 109 (1984), the Supreme
Court applied the private search doctrine to a warrantless search
of a cardboard box.  *Id.* at 111.  A private freight carrier
employee opened a cardboard package to discover its contents after
he noticed that it had been damaged by a forklift.[6]  Inside the box
were five or six pieces of crumpled newspaper covering a tube about
ten inches long.  The employee cut open the tube and found a series
of plastic bags, one inside the other.  The innermost bag contained
about six ounces of white powder.  *Id.*  The employee sought a
federal agent, who conducted his own search of the cardboard box
and performed a chemical test on the white powder, confirming that
the substance was cocaine.  *Id.* at 111-12, and 119.  The Court held
that the federal agent's warrantless search of the box and later
testing of the white powder did not implicate the Fourth Amendment,
because these actions did not exceed the scope of the private
individual's search of the box.  *Id.* at 115-16, 126.

> The initial invasions of [the defendant's]
> package were occasioned by private action.
> Those invasions revealed that the package
> contained only one significant item, a
> suspicious looking tape tube.  Cutting the end
> of the tube and extracting its contents
> revealed a suspicious looking plastic bag of
> white powder.  Whether those invasions were

---

[6]There was evidence that the employee searched the cardboard
box, not because it was damaged by a forklift, as the government
argued, but because he was suspicious about its contents.
*Jacobsen*, 466 U.S. at 115 n.10.  The Court concluded, however, that
this evidence did not affect the constitutionality of the search.
*Id.*

> accidental or deliberate, and whether they
> were reasonable or unreasonable, they did not
> violate the Fourth Amendment because of their
> private character.

*Id.* at 115 (footnote omitted).

"The additional invasions of [defendant's] privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* The Court held that the government's subsequent search of the cardboard box and later chemical testing of its contents did not exceed the scope of the private individual's search, and "hence was not a 'search' within the meaning of the Fourth Amendment." *Id.* at 120. "The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *Id.* at 117.

In *Runyan* the Fifth Circuit more fully defined when a government search exceeds the scope of a prior private search. The defendant in *Runyan*, Robert Beam Runyan ("Robert"), divorced his wife, Judith Runyan ("Judith"). Afterward, Judith made several trips to Robert's ranch to retrieve items she believed were her personal property. *Id.* at 452-53. After their separation, however, Robert erected a gate entrance to the ranch with a chain and lock; he also changed the locks on the house and barn and installed surveillance cameras on the property. *Id.* at 453. On several occasions, Judith and a few friends climbed over the ranch fence and broke into the house and barn to retrieve her belongings.

*Id.* While one of Judith's friends was searching the barn, she came upon a black duffel bag. She opened it and discovered that it contained pornography, compact discs ("CDs"), computer disks, a Polaroid camera with film, and Polaroid pictures of two individuals, one of whom appeared to be a young teenager. *Id.* Another night, Judith and her friends took a desktop computer from Robert's ranch house that Judith asserted was hers, as well as a number of floppy disks, CDs, and ZIP disks. *Id.* When one of Judith's friends reassembled the computer at Judith's residence, she viewed about 20 of the CDs and floppy disks and discovered that they contained child pornography. *Id.* Judith's friend contacted the Sheriff's department and subsequently handed over all of the CDs, ZIP disks, and floppy disks. Over the next few weeks, Judith also turned over to law enforcement agencies a number of the items found at Robert's ranch, including the desktop computer, the black duffel bag and its contents, and numerous other CDs and computer disks containing child pornography. *Id.*

The state police viewed some of the disks on Robert's desktop computer and discovered that they contained child pornography. *Id.* at 454. A county District Attorney also viewed many of the images and printed out some to show staff members. *Id.* Based on these printouts, the District Attorney's Office was able to identify one of the girls in the pictures. *Id.* A federal agent also became involved in the investigation and viewed most of the CDs and

computer disks.  *Id.*

After Robert was indicted on child pornography charges, he moved to suppress all evidence obtained directly and indirectly from the pre-warrant searches of the material taken from his ranch. *Id.* at 455.  The government argued that its pre-warrant searches were protected by the private search doctrine and therefore did not constitute a search within the meaning of the Fourth Amendment. *Id.*  Because Robert did not argue that Judith's and her friends' searches of the material found at his ranch were under color of government authority, the principal issue was whether the government's later search of the same material exceeded the scope of the private individuals' searches.  *Id.* at 460-61.

The Fifth Circuit held that the police exceeded the scope of the private search to the extent they looked at more disks and CDs than did Judith and her friends.[7]  *Id.* at 464.  But the court also held, with respect to each computer disk and CD that had already been viewed by Judith or her friends, that the police did not exceed the scope of the private search by looking at more images on these CDs and disks than did the private individuals.  *Id.* at 464-65.  In other words, "the police [did] not exceed the scope of a prior private search when they examine[d] the same materials that were examined by the private searchers, but they examine[d] these

_____

[7]The court assumed without deciding that each computer storage device (e.g., a CD or disk) was a separate closed container. *Runyan*, 275 F.3d at 462 n.13.

materials more thoroughly than did the private parties." *Id.* at 464 (citing *United States v. Simpson*, 904 F.2d 607 (11th Cir. 1990)). "In the context of a closed container search, this means that the police do not exceed the private search when they examine more items within a closed container than did the private searchers." *Id.* "[A]n individual's expectation of privacy in the contents of a container has already been compromised if that container was opened and examined by private searchers[.]" *Id.* at 465. "Thus, the police do not engage in a new 'search' for Fourth Amendment purposes each time they examine a particular item found within the container." *Id.*

C

As in *Jacobsen* and *Runyan*, Armstrong first searched the cardboard box without any influence from government agents. Both *Jacobsen* and *Runyan* make clear that the private search doctrine is not rendered unavailable to the government simply because Oliver instructed Armstrong "not to mess with" the cardboard box. In *Jacobsen* the Court held that evidence suggesting that the private employee who opened the cardboard package did so, not because it was damaged by a forklift, but because he wanted to know what was in it, was irrelevant to the constitutionality of the search. *Jacobsen*, 466 U.S. at 115 n.10. In *Runyan* the Fifth Circuit held that the private search doctrine applied even though Judith and her friends broke into Robert's house and barn and searched and seized

many items that belonged to Robert and that he had diligently tried to protect by securing the premises. Consequently, applying these principles to the present case, the fact that Armstrong searched the cardboard box despite Oliver's express instructions does not prevent application of the private search doctrine. Moreover, as in *Jacobsen* and *Runyan*, it was Armstrong who led the agents to the cardboard box that she had already searched.

D

The only remaining issue is whether the government proved that the agents' later search of the cardboard box and its contents did not exceed the scope of Armstrong's private search. Armstrong's private search revealed all of the essential objects within the cardboard box: a notebook, a zip-lock plastic bag full of credit cards, an envelope full of identification cards, and some random papers. Of these items found inside the cardboard box, only the plastic bag and the envelope could be considered separate, closed containers for purposes of the private search doctrine. Assuming that the zip-lock plastic bag full of credit cards was a separate closed container, Armstrong's review of its contents constitutes a search of the plastic bag even if she did not open the zip-lock bag. In *Jacobsen* the Court held that the private freight carrier employee searched the plastic bag containing the white powder even though there was no evidence that he actually opened the last bag that contained the powder. It was sufficient that the employee was

able to identify what was inside the bag without opening it. Likewise, although there is no evidence that Armstrong opened the plastic bag with the credit cards, she was able see through the plastic to identify its elements: an assortment of credit cards. As to the envelope, assuming that it was also a closed container, Armstrong must have opened it, because she was able to identify its contents: a number of identification cards. Thus in searching the cardboard box without a warrant, the agents did not search any closed container that Armstrong had not already searched.

Applying *Runyan* to this case, the court holds that the government proved that the agents did not exceed the scope of Armstrong's private search by examining the cardboard box's contents more thoroughly than did Armstrong. Even if Armstrong did not conduct a page-by-page examination of the notebook or paperwork contained inside the box, the agents' subsequent detailed search[8] of each page of the notebook and paperwork did not exceed the scope of Armstrong's search. This is so because Armstrong already knew essentially what these items were. Similarly, the agents' search of all of the credit cards did not exceed Armstrong's search of these items—even if Armstrong only viewed some of the credit cards—just as the police's search in *Runyan* of all the images on

_____

[8]The government did not offer any evidence regarding the scope of its search of the cardboard box's contents. Because the government bears the burden of proof, the court assumes that the agents searched in detail everything in the cardboard box.

a particular disk did not exceed the scope of the private search, which was limited to only a few of the images on the disk. On the same basis, the agents' more thorough review of the identification cards did not exceed the scope of Armstrong's private search of them.

Because the agents' search of the cardboard box did not exceed the scope of Armstrong's private search, it fits within the private search doctrine and did not constitute a search under the Fourth Amendment. Because the government has proved that the private search doctrine applies, the court denies Oliver's motion to suppress the contents of the cardboard box.

## IV

Finally, the court must decide whether evidence from the laptop computer——which agents seized without a warrant——must be suppressed. The court need not analyze whether Armstrong possessed real or apparent authority to consent to the seizure of the laptop. Assuming *arguendo* that she lacked such authority——and that the government's initial seizure of the laptop was therefore unlawful——the government's later re-seizure of the laptop pursuant to a search warrant fits within the independent source doctrine.

## A

The independent source doctrine "permits the introduction of unlawfully discovered evidence when the police have acquired that evidence through a distinct, untainted source." *United States v.*

*Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000). "Animating this doctrine is the recognition that the goal of the exclusionary rule is to put the police 'in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.'" *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). "'When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'" *Id.* (quoting *Nix*, 467 U.S. at 443).

In *Grosenheider* the defendant argued that the independent source rule applies only to unlawful searches and not to unlawful seizures. *Id.* at 328 ("[The defendant] argues that . . . a later independent 're-seizure' can never cure an initial illegal seizure."). The Fifth Circuit rejected the defendant's contention. "'[S]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply.'" *Id.* at 329 (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)).

B

Oliver does not dispute the fact that within one month of the agents' initial seizure of the laptop computer at Armstrong's apartment, the government obtained a warrant to search the computer's contents. Nor does Oliver argue that this search warrant for the laptop computer was based on tainted knowledge or

fruit of the poisonous tree.  Because the lawfulness of the search

warrant for the laptop computer is not challenged, and because

Oliver has the burden of proving by a preponderance of the evidence

that the challenged search of the laptop, pursuant to a warrant,

was unconstitutional, *see, e.g., Waldrop*, 404 F.3d at 368, the

court denies Oliver's motion to suppress the search of the laptop

computer on the ground that it was unlawfully seized.[9]

*     *     *

For the foregoing reasons, the court denies Oliver's March 4,

2008 motion to suppress.

**SO ORDERED.**

April 25, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

---

[9]Even if the court assumes that the government has the burden
of proving by a preponderance of the evidence that the laptop
computer was lawfully searched, the court holds that it has met its
burden.